United States District Court
Southern District of Texas
**ENTERED**
October 22, 2021
Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| KENNETH WHITE, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. H-20-2813 |
| | § | |
| UNITED PARCEL SERVICE, INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND OPINION

Kenneth White, a 55-year-old black male diagnosed as suffering from severe posttraumatic stress disorder, anxiety disorder, and major depression, has worked for the United Parcel Service for over 15 years, starting as a peak season driver and working his way up to management positions. White alleges that since 2017, UPS and its employees discriminated and retaliated against him. White alleges that his coworkers and supervisors made many racial slurs to him, calling him "Scooby," "old dog," "unc," and "b**** a** n****." One coworker allegedly threatened to shoot White's Mercedes. UPS investigated some of these incidents but did not demote, fire, or put any of the alleged offenders on unpaid leave. White alleges that UPS demoted him after he filed a charge of discrimination. White also claims that UPS did not grant his request for accommodations for his disabilities.

White is currently on a leave of absence. He has sued UPS for age discrimination, disability discrimination, and retaliation under the Texas Commission on Human Rights Act, TEX. LAB. CODE § 21.001, *et seq.*, and the Americans with Disabilities Act, 42 US.C. § 12101, *et. seq.* White has abandoned his state and federal Title VII race discrimination claims. (Docket Entry No. 39 at 5).

UPS has moved for summary judgment, White responded, and UPS replied.  (Docket Entry Nos. 34, 39, 44).  Based on the motion, response, and reply; and the applicable law, the court grants the motion for summary judgment, except as to the retaliation claim for the alleged incidents between April 2020 and July 2020.  The reasons are explained below.

## I.    Background

White began working at UPS in 2005 as a temporary driver during peak seasons.  (Docket Entry No. 34 at 9; Docket Entry No. 39 at 9).  White received several promotions, and in 2015, he became a Business Manager at UPS's Lakeside Center, where he monitored packages, handled delivery errors, and helped with personnel management.  (Docket Entry No. 34-1 at 7–8; Docket Entry No. 39-2 at ¶ 2).  Lakeside Center was one of four centers in the UPS Stafford Hub division. (Docket Entry No. 34 at 10; Docket Entry No. 39 at 10 n.5).  In 2017, right before the peak season—which begins around November and lasts through January—White was transferred to another UPS Stafford Hub division center, the Southwest Center.  (Docket Entry No. 34-1 at 12). Kyle Shumaker was the Division Manager of the Stafford Hub.  (*Id.*).

From December 2017 through January 2018, Shumaker allegedly used derogatory terms when speaking to White at work.  Shumaker frequently called White "unc," "old dog," and "Uncle Kenny."  (Docket Entry No. 39-2 at ¶ 3; Docket Entry No. 39-12).  Shumaker used the office radio channel to tell White that his wife had left "Scooby Snacks" for him.  (Docket Entry No. 34-1 at 15).

In January 2018, Shumaker transferred White to a Preload Manager position, in which his shift would begin in the middle of the night.  Shumaker told White that his Business Manager position would be taken by Bertram Wyre.  (*Id.* at 14).  Around this time, White reported Shumaker's harassment to Ron Mayorga, an operations manager overseeing the Stafford Hub.  (*Id.*

at 16).  Mayorga encouraged White to see a doctor.  (*Id.*).  After a doctor's visit, White took a medical leave of absence from late January 2018 to June 2018, due to high blood pressure and neurological pain induced by stress.  (Docket Entry No. 39-1 at 24–25; Docket Entry No. 39-15).

When White returned to work, he was assigned to the Mykawa Center, outside the Stafford Hub.  (Docket Entry No. 34 at 13; Docket Entry No. 39-1 at 27).  Several months later, White was transferred back to the Southwest Center as a Business Manager.  (Docket Entry No. 39-2 at ¶ 5).  Shumaker was on leave at the time.  (*Id.*).  When Shumaker returned in late 2018, White alleges, the derogatory remarks began again.  (*Id.*; Docket Entry No. 39-1 at 30–31; Docket Entry No. 39-12).

Shumaker transferred White to the Katy Center in December 2018.  (Docket Entry No. 39-1 at 30–31; Docket Entry No. 39-2 at ¶ 5; Docket Entry No. 39-12).  On March 29, 2019, White attended a manager meeting.  (Docket Entry No. 39-1 at 35–36).  He alleges that Corey White, another supervisor from a different Stafford Hub center, threatened to shoot White's Mercedes and to kiss White on the cheek.  (*Id.*).  At another manager meeting later that day, Corey reportedly lost control, hit the conference room table, and "cornered" White.  (Docket Entry No. 39-16 at 3, 7–9).  White discussed the incidents with the acting Division Manager that day, Rodney Reed.  (Docket Entry No. 39-10 at 16–19).  White also called the UPS "corporate concern" line to report anonymously Corey's behavior.  (Docket Entry No. 39-1 at 39).  UPS investigated the incident.  White alleges that UPS took little to no action to address Corey's behavior.  White again took medical leave, during which he alleges that he was diagnosed with severe depression, anxiety, and posttraumatic stress disorder.  (Docket Entry No. 39 at 15; Docket Entry No. 39-20 at ¶ 3).

In September 2019, while on medical leave, White filed a formal charge of discrimination with the U.S. Equal Employment Opportunity Commission and the Texas Workforce Commission,

Civil Rights Division.   (Docket Entry No. 39 at 40; Docket Entry No. 39-3).   White's discrimination charge described the events with Shumaker, Corey, and the transfers he had experienced since 2017.   (Docket Entry No. 39-3).   White received dismissal and right-to-sue letters from the Equal Employment Opportunity Commission in October 2019 and from the Texas Workforce Commission in March 2020.   (Docket Entry No. 15 at ¶¶ 6–8; Docket Entry No. 34 at 21; Docket Entry No. 34-32).

White returned to work in early April 2020, a year after the incident with Corey.   (Docket Entry No. 34 at 16; Docket Entry No. 39 at 17).   White notified UPS that he now requested accommodations for his medical conditions.   (Docket Entry No. 34 at 16; Docket Entry No. 39 at 17; Docket Entry No. 39-22).   UPS opened an accommodation request file and notified White that it could not complete the request file because it was missing a page.   (Docket Entry No. 39-14).   White did not send the missing page until May 2020.   UPS then opened an "Accommodation Request Activity Log" to determine what accommodations UPS could provide White.   (Docket Entry No. 39-25 at 11–19).

During this time, White was assigned to a Preload Manager position in the Stafford Hub.   (Docket Entry No. 34 at 16–17; Docket Entry No. 39 at 17).   White alleges that he was not given a private office and key, which had been provided in previous similar management positions, and he was excluded from managers' meetings.   (Docket Entry No. 39-1 at 49–50; Docket Entry No. 39-2 at ¶¶ 9, 11).

White also alleges hostility from his coworkers after he returned to work.   One of the business managers, Rodney Edwards, said to White on seeing him for the first time, "look who rose from the dead."   (Docket Entry No. 39-1 at 49).   In June 2020, Edwards allegedly called White a "b**** a** n****."   (Docket Entry No. 39-34 at 7).   Although no witnesses confirmed the racial

slur in UPS's investigation, multiple witnesses confirmed that Edwards acted unprofessionally towards Edwards.  (*Id.* at 4).  Despite this, White claims that UPS required Edwards only to take "a couple of computer classes as a slap on the wrist."  (Docket Entry No. 39 at 19).

White took medical leave again in July 2020, based on stress and anxiety.  (Docket Entry No. 39 at 21).  During this leave, White again filed a formal discrimination charge with the Texas Workforce Commission and the Equal Employment Opportunity Commission based on the failure to grant his accommodations request, his working conditions as a Preload Manager, and his encounters with Rodney Edwards.  (Docket Entry No. 15 at ¶ 9; Docket Entry No. 34-20).  White received a dismissal and right-to-sue letter from the Equal Employment Opportunity Commission in July 2020.  (Docket Entry No. 15 at ¶ 9; Docket Entry No. 34-33).

White applied for early retirement in July 2021, (Docket Entry No. 39-2 at ¶ 16), and is currently on a leave of absence.  (Docket Entry No. 34 at 9; Docket Entry No. 34-1 at 5).  This motion and response followed discovery.

## II.    Legal Standard

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd ex rel. Est. of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)).  "A material fact is one that might affect the outcome of the suit under governing law," and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Renwick v. PNK Lake Charles, LLC*, 901 F.3d 605, 611 (5th Cir. 2018) (citations and internal quotation marks omitted).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion,"

and identifying the record evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014). "A party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Lamb v. Ashford Place Apartments LLC*, 914 F.3d 940, 946 (5th Cir. 2019) (citation and internal quotation marks omitted). In deciding a summary judgment motion, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his or her favor." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 972 (5th Cir. 2019) (alterations omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)).

## III.   The Summary Judgment Evidence

In support of its motion, UPS submits the following summary judgment evidence:

- excerpts of White's deposition testimony, (Docket Entry No. 34-1);

- emails from White seeking time off between April 2020 and June 2020, (Docket Entry No. 34-24);

- declarations by UPS employees, including Stafford Division Manager Joseph Winston, former Human Resources Operations Manager Aaron Times, former Stafford Division Manager Kyle Shumaker, former Area Human Resources Manager Shraya Williams, South Operations Manager Elizabeth Johnson, Preload Manager Kyle Arter, and Occupational Health Supervisor Patricia Lorio, (Docket Entry Nos. 34-3, 34-5, 34-6, 34-13, 34-18, 34-19, 34-23);

- UPS documents showing essential job functions for management positions, (Docket Entry No. 34-4);

- White's formal discrimination charges with the Equal Employment Opportunity Commission and the Texas Workforce Commission and related paperwork, (Docket Entry Nos. 34-7, 34-20, 34-32);

- UPS documents on White's work performance, (Docket Entry Nos. 34-8, 34-9);

- White's accommodation requests and related paperwork, (Docket Entry Nos. 34-10, 34-21, 34-22, 34-25, 34-26, 34-29, 34-33);

- documents showing White's leave from work and related paperwork, (Docket Entry Nos. 34-2, 34-11, 34-16, 34-17, 34-27, 34-28);

- UPS documents on workplace incident reports, (Docket Entry Nos. 34-12, 34-14, 34-30, 34-31);

- UPS documents on courses Corey White has taken, (Docket Entry No. 34-15); and

- a summary of White's claims and allegations, (Docket Entry No. 34-34).

In support of his response to UPS's summary judgment motion, White submits the following summary judgment evidence:

- excerpts of deposition testimony by White, Joseph Winston, Aaron Times, former Southwest Center Manager Rodney Reed, and Shraya Williams, (Docket Entry Nos. 39-1, 39-8, 39-9, 39-10, 39-11);

- declarations by White, (Docket Entry No. 39-2);

- White's formal discrimination charges with the Equal Employment Opportunity Commission and the Texas Workforce Commission, (Docket Entry Nos. 39-3, 39-4, 39-5, 39-6, 39-7);

- emails between White and other UPS employees, (Docket Entry Nos. 39-12, 39-21, 39-29, 39-30, 39-31, 39-33, 39-36, 39-43);

- a UPS employee file of Bertran Wyre, (Docket Entry No. 39-13);

- White's accommodation requests and related paperwork and communications, (Docket Entry Nos. 39-14, 39-20, 39-22, 39-23, 39-24, 39-25, 39-26, 39-27, 39-50);

- documents showing White's leave from work and related paperwork and communications, (Docket Entry Nos. 39-15, 39-19, 39-37, 39-38, 39-39, 39-44);

- documents showing workplace incident reports, (Docket Entry Nos. 39-16, 39-34, 39-35, 39-51);

- UPS employee evaluations, (Docket Entry Nos. 39-17, 39-18, 39-40, 39-41, 39-42);

- the UPS Workplace Violence Policy, (Docket Entry No. 39-28);

- photos of White's workspace, (Docket Entry No. 39-32);

- UPS objections to White's discovery requests, (Docket Entry Nos. 39-45, 39-46, 39-47, 39-48); and

- UPS's ADA Procedural Compliance Manual, Section 2: The UPS Accommodations Process, (Docket Entry No. 39-49).

White raises several evidentiary objections to the evidence UPS submitted in support of its summary judgment motion.  The objections are to:

- paragraphs 8 and 9 of the declaration of Joseph Winston, on the basis that he lacked personal knowledge, (Docket Entry No. 34-3 at ¶¶ 8–9);

- Aaron Times's statements in his declaration that: (1) certain management positions are "co-equal," on the basis that it is conclusory; (2) a change from a Business Manager to a Preload Manager position would not be a demotion or change in compensation, on the basis that it contradicts his deposition testimony; and (3) circumstances of UPS's investigation of the Edwards incident, on the basis that Times lacked personal knowledge, (Docket Entry No. 34-5);

- paragraph 7 of the declaration of Kyle Shumaker, on the basis that it contains conclusory statements, (Docket Entry No. 34-6 at ¶ 7);

- paragraphs 7, 9, and 11 of the declaration of Shraya Williams, on the basis that she lacked personal knowledge, (Docket Entry No. 34-13 at ¶¶ 7, 9, 11);

- paragraph 5 of the declaration of Patricia Lorio, on the basis that she lacked personal knowledge, (Docket Entry No. 34-23 at ¶ 5); and

- a spreadsheet summarizing White's claims, on the basis that it is hearsay and conclusory, (Docket Entry No. 34-34).

UPS objects to the evidence White submitted in support of his response to UPS's motion.

The objections are to:

- the portions of White's deposition testimony stating that White was told by another, unknown manager that his pay could be reduced after being in a Preload Manager position for a year and to White's deposition testimony explaining that he understood from his doctor that he was experiencing tingling on the left side of his body and heart issues— leading to his January 2018 medical leave, on the basis that the statements are hearsay, (Docket Entry No. 39-1 at 18, 24–25);

- the portions of White's declaration about the thoughts, perceptions, or beliefs of other individuals, about which White has no personal knowledge, (Docket Entry No. 39-2 at ¶¶ 4, 6, 11, 15, 16);

- photographs of White's alleged workspace, on the basis that they are not authenticated, (Docket Entry No. 39-32); and

- statements made by Brandon Crawford in a UPS incident report, on the basis that they are not authenticated and are hearsay, (Docket Entry No. 39-51).

Under Fed. R. Civ. P. 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).  "Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . , the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (alteration in original) (quoting 11 MOORE'S FEDERAL PRACTICE-CIVIL ¶ 56.91 (2017))).  Objections on the basis that certain witnesses lack personal knowledge or are conclusory are overruled because the witnesses have attested that their statements are within their understanding or knowledge based on their job duties.  The credibility of those statements are issues for trial.

White's objection to UPS's spreadsheet summarizing White's claims is also overruled, although it does not affect the analysis or outcome.  UPS's objections to White's testimony on the basis that certain statements are hearsay are overruled because the statements are not relied on for the truth of the contents.  UPS's objection to White's photographs are overruled on the basis that the photographs are not authenticated because a court may rely on evidence at summary judgment

that may be put into admissible form at trial.  *See Maurer v. Indep. Town*, 870 F.3d 380, 384 (5th Cir. 2017) ("At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form.").  UPS's objection to Brandon Crawford's statements is sustained because they are used for the truth of the matter asserted and White has established no predicates for a hearsay exception to apply.  FED. R. EVID. 801, 802.  To the extent White makes statements about the thoughts, perceptions, and beliefs of others and not himself, UPS's objections to those statements are sustained because they are speculative.  *See* FED. R. EVID. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").  In addition, whether the objected to evidence is considered or given little or full weight, the objections are moot because they do not affect the court's analysis or conclusion.

## IV.    The Time-Barred Claims

UPS argues that all claims based on incidents that occurred before March 27, 2019, are barred because White did not timely file an administrative discrimination charge with a state or federal employment agency as to those incidents.  White invokes the continuing violations doctrine.

White brings his age discrimination and retaliation claims under the Texas Commission on Human Rights Act.  TEX. LAB. CODE §§ 21.051, 21.055, 21.101; (*see* Docket Entry No. 39 at 40).  He filed his first charge of discrimination with the Equal Employment Opportunity Commission and the Texas Workforce Commission on September 23, 2019.  (Docket Entry No. 15 at ¶ 6; Docket Entry No. 39 at 40; Docket Entry No. 39-3).  Under the Texas Commission on Human Rights Act, an administrative complaint must be filed "no later than 180 days after the alleged [] act."  *Pequeño v. Univ. of Tex. at Brownsville*, 718 Fed. Appx. 237, 242 (5th Cir. 2018) (citing

TEX. LAB. CODE § 21.202(a)).  Failing to do so bars recovery on a cause of action based on that alleged discriminatory or retaliatory act.  *Id.* at 242–43; *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 281 (5th Cir. 2004).  Because White filed his complaint on September 23, 2019, the court may not consider incidents occurring before March 27, 2019,[1] as a basis for recovery, unless an exception applies.

"An exception to the application of the 180-day limitations period is the continuing violation doctrine."  *Santi v. Univ. of Tex. Health Sci. Ctr. at Hous.*, 312 S.W.3d 800, 804 (Tex. App.—Houston [1st Dist.] 2009, no pet.).  "Under the continuing violations doctrine, a plaintiff may complain of otherwise time-barred discriminatory acts if it can be shown that the discrimination manifested itself over time, rather than in a series of discrete acts."  *Frank v. Xerox Corp.*, 347 F.3d 130, 136 (5th Cir. 2003); *see also Gilles-Gonzalez v. Univ. of Tex. Sw. Med. Ctr.*, No. 05-16-00078-CV, 2016 WL 3971411, at *3 (Tex. App.—Dallas July 22, 2016, no pet.) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)).

"[T]he continuing violations doctrine applies when there is 'an organized or continuing effort to discriminate.'"  *Hackett v. United Parcel Serv.*, 736 Fed. Appx. 444, 449 (5th Cir. 2018) (quoting *Frank*, 347 F.3d at 136).  "When such 'continuing violation' discrimination occurs, the 180-day filing clock does not begin to run until one of the involved discriminatory events should, in fairness and logic, have alerted the average layperson to act to protect his or her rights."  *Univ. of Tex. v. Poindexter*, 306 S.W.3d 798, 808 (Tex. App.—Austin 2009, no pet.) (citation and internal quotation marks omitted).  "The end goal of the continuing violation theory is to

---

[1] March 27, 2019, is 180 days before September 23, 2019.  *See* FED. R. EVID. 201(b) ("The Court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *see also* 1 STEPHEN A. SALTZBURG, MICHAEL M. MARTIN, & DANIEL J. CAPRA, FEDERAL RULES OF EVIDENCE MANUAL § 201.03[2][c] (12th ed. 2019) (considering the calendar dates and time as the kinds of facts that can be judicially noticed).

'accommodate plaintiffs who can show that there has been a pattern or policy of discrimination continuing from outside the limitations period into the statutory limitations period, so that all of the discriminated acts committed as part of this pattern or policy can be considered timely.'" *Pegram*, 361 F.3d at 279 (citation omitted).

White alleges discrete acts of age discrimination and retaliation before March 27, 2019, including: (1) Shumaker's sporadic ageist comments to White during late 2017 to January 2018; (2) Shumaker's January 2018 transfer of White from a Business Manager position to a Preload Manager position at the Southwest Center; (3) White's placement at the Mykawa Center in June 2018; (4) White's October 2018 transfer back to the Southwest Center as a Business Manager; and (5) White's December 2018 transfer to the Katy Center. White alleges that after March 27, 2019, but before White filed his formal charge of discrimination on September 23, 2019, UPS discriminated against him by failing to discipline Corey more severely for his March 29, 2019, encounter with White.

The allegations and evidence as to Shumaker's comments, White's position transfers from 2017 to 2018, and the March 29, 2019, incident in which Corey threatened to shoot White's Mercedes and kiss him on the cheek are of separate and discrete acts, each of which should have alerted White that he had a basis to assert his rights. *See Hackett*, 736 Fed. Appx. at 449 (a work transfer "merely related to acts alleged in timely filed charges," was a discrete act (citation and internal quotation marks omitted)); *Henson v. Bell Helicopter Textron, Inc.*, 128 Fed. Appx. 387, 390–91 (5th Cir. 2005) (per curiam) (a supervisor's refusal to excuse the plaintiff from certain work duties, denial of transfer requests, and failure to provide accommodations, were all discrete acts). White does not explain how the allegations that Shumaker made certain comments and transferred White to other management positions—both before March 27, 2019—relate to the

incident with Corey, which was after March 27, 2019. *See Mack v. John L. Wortham & Son, L.P.*, 541 Fed. Appx. 348, 356 (5th Cir. 2013) (per curiam) (the continuing violations doctrine did not apply when the plaintiff "failed to demonstrate a connection between the incidents" involving alleged discrimination).

White has not submitted or pointed to record evidence that would permit a reasonable jury to infer that the Corey incident, Shumaker's comments, and White's position transfers were all part of a continuing or organized effort to discriminate or retaliate against White, or that the incidents before March 27, 2019, did not give White a basis to seek relief.

The continuing violations exception does not apply to toll White's administrative filing period. White's claims based on incidents that occurred before March 27, 2019, are time-barred.

## V.     The Age Discrimination Claim

White's age discrimination claim is based on UPS's alleged failure to respond adequately to the incident with Corey. UPS argues that its response to the incident was not an adverse employment action as to White; there is no evidence that White was treated less favorably than similarly situated coworkers; and that it had legitimate and nonpretextual reasons for its decisions. White argues that there are multiple fact and credibility determinations requiring a jury trial.

The Texas Commission on Human Rights Act prohibits age discrimination in employment practices. TEX. LAB. CODE §§ 21.051, 21.055, 21.101. "An employer commits an unlawful employment practice under the statute 'because of' an employee's age if the employee's age was 'a motivating factor' for the practice, 'even if other factors also motivated the practice.'" *City of Richland Hills v. Childress*, No. 02-20-00334-CV, 2021 WL 4205013, at *3 (Tex. App.—Fort Worth 2021, no pet.) (quoting TEX. LAB. CODE § 21.125(a)). A plaintiff may prove discrimination

with direct evidence or "with indirect or circumstantial evidence of discrimination or retaliation." *Id.* at *4.

When the evidence is indirect, Texas courts follow the federal *McDonnell Douglas* burden-shifting framework to resolve summary judgment motions and use analogous federal statutes and cases to guide their approach in interpreting the Texas Commission on Human Rights Act. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, "a plaintiff has the initial burden of establishing a *prima facie* case of discrimination." *Ross v. Judson Indep. Sch. Dist.*, 993 F.3d 315, 321 (5th Cir. 2021) (citation omitted). "If [he] does so, the burden then shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason' for its action," and "[i]f the defendant can provide a reason, then the burden shifts back to the plaintiff to prove that the reason is pretextual." *Id.*; *see also Texas Tech Univ. Health Scis. Ctr.-El Paso v. Flores*, 612 S.W.3d 299, 305 (Tex. 2020) (citation omitted).

"To establish a *prima facie* case of age discrimination under the [Texas Commission on Human Rights Act], the plaintiff must establish that '[he] (1) was a member of the protected class [forty years of age or older]; (2) was qualified for the position at issue; (3) suffered a final, adverse employment action; and (4) was either (a) replaced by someone significantly younger or (b) otherwise treated less favorably than others who were similarly situated but outside the protected class.'" *Ross*, 993 F.3d at 321 (citing *Flores*, 612 S.W.3d at 305).

UPS was notified through its anonymous hotline call number of the incident involving Corey and White on March 29, 2019. (Docket Entry No. 39-16). White later admitted to being the caller. (Docket Entry No. 39-1 at 39). On the call, White reported that at a managers' meeting, Corey yelled, "I will shoot your black Mercedes and then I will give you a kiss on the cheek."

14

(Docket Entry No. 39-16 at 3).  White also reported that later the same day, "Corey lost control and cleared out everything on the table and cornered the caller."  (Docket Entry No. 39-16 at 3).

In response to White's hotline call, UPS interviewed individuals present at the meeting. Business Manager Brandon Crawford corroborated White's report, explaining that Corey had been upset at statements White made to Corey insinuating that Corey was not reporting his numbers correctly.  Crawford also told UPS that Corey stated to White, "Keep playing with me Unc," and that White asked Rodney Reed, the acting Division Manager of the Stafford Hub, to remove Corey from the room multiple times.  (Docket Entry No. 39-16 at 7).  Another employee present at the meeting recalled that Corey mentioned White's Mercedes.  (*Id.*).  Rodney Reed reported to UPS that although he was distracted by a phone call when the encounter between Corey and White began, he later saw Corey hit the table.  (Docket Entry No. 39-16 at 8–9).

UPS was unable to substantiate all that White reported on the hotline call.  Aaron Times, one of the UPS Human Resources staff, stated that after investigating, UPS counseled Corey on UPS policies forbidding unprofessional, threatening, or harassing behaviors.  UPS also required Corey to complete several training courses on business ethics and appropriate behavior in the workplace environment.  (Docket Entry No. 34-5 at ¶ 6; Docket Entry No. 34-15).  White argues that Times's statements are not credible because Times testified that he could not remember the specific names of the classes UPS required Corey to take.  White points to testimony from another UPS Human Resources staff member, Shraya Williams, that UPS would document coaching or counseling of Corey, but UPS has not produced such documents.  (Docket Entry No. 39 at 14–15; Docket Entry No. 39-11 at 5).  UPS did produce a list of classes Corey took on business ethics and workplace behavior.  (Docket Entry No. 34-15).  White argues that even though the classes were

in the months following the incident, that does not show that Corey took the classes because of the incident.  (Docket Entry No. 39 at 14).

Although it is undisputed that White is a member of a protected class because he is over 40 years old, he must plead and point to evidence showing that he was subject to an adverse employment action.  "[A]dverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating."  *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007) (citation omitted).  "An employment action that does not affect job duties, compensation, or benefits is not an adverse employment action."  *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 824 (5th Cir. 2019) (citation and internal quotations omitted).  White and UPS dispute whether UPS took adequate measures to discipline Corey, but viewing all facts and inferences in White's favor, UPS's discipline of Corey in response to his workplace behavior toward White was not an adverse employment action as to White.  *See Gibson v. Hoshizaki Am. Inc.*, No. 4:20-CV-046-A, 2021 WL 200523, at *6 n.7 (N.D. Tex. Jan. 20, 2021) (a failure to investigate plaintiff's report of assault to plaintiff's satisfaction was not an adverse employment action).  No similar incidents have occurred between White and Corey since UPS investigated the incident, (Docket Entry No. 34-1 at 36–37), which belies any claim by White that UPS's response to the Corey incident resulted in substantially adverse changes to White's employment conditions.  *Cf.  Marshall v. McDonough*, No. 2:20-CV-215-M-BR, 2021 WL 3917001, at *7 (N.D. Tex. July 15, 2020) (allegations that a failure to investigate led to a demotion).

White's *prima facie* case fails for an additional reason.  He neither pleads facts nor points to evidence showing that the way UPS disciplined Corey treated White less favorably than others similarly situated but outside the protected class.  White points to nothing supporting an inference

that UPS would or did have different responses to similar reported workplace incidents when persons under the age of 40 reported the incident.

White has failed to make a *prima faci*e showing of age discrimination under the Texas Commission on Human Rights Act, and he has failed to submit or point to record evidence showing that he received treatment that was dissimilar to other employees younger than 40 years old and outside his protected class.  His age discrimination claim may not proceed.

## VI.     The Disability Discrimination Claims

White argues that UPS discriminated against him on the basis of his disabilities when it failed to engage in an interactive process to determine reasonable accommodations for White's medical conditions, and when it failed to accommodate these disabilities.  He asserts claims under the Texas Commission on Human Rights Act and the Americans with Disabilities Act, 42 US.C. § 12101, *et. seq.*  UPS argues that White was not a qualified individual and that he has not identified a reasonable accommodation that UPS could have implemented.

The Americans with Disabilities Act prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . advancement . . . of employees . . . and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a); *see also* TEX. LAB. CODE § 21.051.  "In discrimination and retaliation cases under the [Texas Commission on Human Rights Act], Texas jurisprudence parallels federal cases construing and applying equivalent federal statutes."  *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 781 (Tex. 2018).

"When a qualified individual with a disability requests a reasonable accommodation, the employer and employee should engage in flexible, interactive discussions to determine the appropriate accommodation."  *E.E.O.C. v. Agro Distrib.*, 555 F.3d 462, 471 (5th Cir. 2009).

17

"[W]hen an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA." *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999).  However, "an employer cannot be found to have violated the ADA when responsibility for the breakdown of the 'informal, interactive process' is traceable to the employee and not the employer." *Id.* (citations omitted).  "Ultimately, both the employer and the employee are obligated to communicate with one another so that the process of identifying an appropriate accommodation can unfold." *Jurach v. Safety Vision, LLC*, 642 Fed. Appx. 313, 318 (5th Cir. 2016) (citing *Loulseged*, 178 F.3d at 737).

Disability "discrimination [also] includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" *Jones v. Lubbock Cty. Hosp. Dist.*, 834 Fed. Appx. 923, 926 (5th Cir. 2020) (per curiam) (citing 42 U.S.C. § 12112(b)(5)(A)).  White "must prove the following statutory elements to prevail in [his] failure-to-accommodate claim: (1) [he] is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations." *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 587 (5th Cir. 2020) (quoting *Feist v. La., Dep't of Justice, Office of the Att'y Gen.*, 730 F.3d 450, 452 (5th Cir. 2013)).  "The plaintiff can show the 'qualification' element in one of two ways: (1) by proving that he can perform all essential job functions with or without modifications or accommodations; or (2) by showing that some reasonable accommodation by the employer would enable him to perform the job." *Donaldson v. Tex. Dep't of Aging and Disability Servs.*, 495 S.W.3d 421, 437 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (citing *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1093 (5th Cir.1996)).  "The ADA provides a right to reasonable accommodation, not to the employee's preferred

accommodation." *Agro Distrib.*, 555 F.3d at 471 (citation omitted).  "The plaintiff bears the burden of proving that an available position exists that he was qualified for and could, with reasonable accommodations, perform."  *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007).

After returning from his year-long second medical leave of absence, White sent UPS an accommodations request on April 1, 2020.  (Docket Entry No. 39 at 16).  UPS and White dispute whether White's initial request contained all necessary pages, (Docket Entry No. 34-23 at ¶ 3; Docket Entry No. 39-25 at 7).  White admits that UPS contacted him soon after received his accommodation request to notify him that it could not be processed because a page was missing. (Docket Entry No. 39 at 16).  White did not respond, and in late April 2020, UPS closed White's request.  (Docket Entry No. 34-26; Docket Entry No. 39-24 at 5–9).  Not realizing that UPS had sent White emails about the page needed to consider his request, White's counsel sent a letter to Times in the UPS Human Resources department inquiring about the request.  (Docket Entry No. 39-26).  Times did not respond to that letter.  (Docket Entry No. 39-9 at 4–6).  In May 2020, when White realized that UPS had sent him emails, he resubmitted the missing page, and UPS opened an "Accommodations Request Activity Log."  (Docket Entry No. 34 at 18; Docket Entry No. 39-25 at 11–14).

White's accommodation request paperwork included a document from a healthcare provider listing several essential job functions that White would be unable to perform due to his medical conditions.  These functions include that:

- "[White] cannot work extended hours";

- "[White] cannot work varying shifts";

- "[White] does not have sufficient ability to work in an environment with exposure to noise, enclosed work area, co-workers"; and

- "[White] may not have consistent ability to follow directions, concentrate, memorize, recall, processing up to 2-3 steps ahead, perform other functions as assigned."

(Docket Entry No. 34-10 at ¶ 2).  White's healthcare provider suggested that he "could possibly work in a quiet, non-demanding position in an environment he perceives as safe, part time, at home or full time on a trial basis."  (*Id.* at ¶ 3(b)).

In May 2020, UPS received White's complete accommodation request.  White and UPS dispute whether UPS then tried to contact White to schedule an appointment to discuss potential accommodations.  UPS asserts that Shraya Williams, the Human Resources staff, had difficulties scheduling a meeting because White was absent from work at least seven times between April 24, 2020 and June 23, 2020.  (Docket Entry No. 34-13 at ¶ 10; Docket Entry No. 34-24).  White agrees that from April 2020 to June 2020, he left early on five days and missed two full days of work, but he disputes whether this made it difficult for UPS to arrange a date and time to meet.  (Docket Entry No. 39-29, 39-30, 39-31).  White points out that UPS submitted no documents showing its attempts to contact White, and that Williams testified that the attempts would have been documented if made.  (Docket Entry No. 39 at 33; Docket Entry No. 39-11 at 8).

UPS Human Resources personnel determined that no management position and no open nonmanagement position existed that could be modified to eliminate extended hours, varying shifts, exposure to noise, work with coworkers, and the need for problem-solving.  On July 24, 2020, UPS notified White that it closed his accommodations request again but that he could open another request in the future.  (Docket Entry No. 34-13 at ¶¶ 11–12; Docket Entry No. 34-23 at ¶ 6; Docket Entry No. 34-29).  During this time, White continued to work.  (Docket Entry No. 39 at 31).

The parties dispute whether UPS engaged in an interactive process with White, but this is immaterial because White's failure-to-engage and failure-to-accommodate claims both fail.  White

has made no showing that UPS failed to provide reasonable accommodations.  The Fifth Circuit has recognized that "even if a genuine issue of material fact exists as to whether [an employer] participated in the interactive process in good faith, its dereliction cannot be said to have led to a failure to reasonably accommodate [an employee]," when "there is no evidence that a reasonable accommodation was feasible."  *Silva v. City of Hidalgo, Tex.*, 575 Fed. Appx. 419, 424 & n.3 (5th Cir. 2014) (per curiam).

White has pointed to no record evidence that the accommodations his physician identified—a nondemanding, part-time, quiet work environment separate from coworkers and with no noise exposure, in which White's inability to consistently focus or follow directions would not be a problem—were reasonable.  White has admitted that UPS management positions require managers to be in noisy environments, to supervise employees, and to concentrate and focus on problem-solving throughout the day.  (Docket Entry No. 34-1 at 10).  White pointed to no evidence of open positions that could accommodate his restrictions.  *Windhauser v. Bd. of Supervisors for La. State Univ. & Agr. & Mechanical College*, 360 Fed. Appx. 562, 566–67 (5th Cir. 2010) (per curiam) (affirming summary judgment when the plaintiff failed to present evidence that his requested accommodations were reasonable).

Summary judgment on White's disability discrimination claims is granted.

## VII. The Retaliation Claim

White alleges that UPS retaliated against him for filing a formal charge of discrimination with the Equal Employment Opportunity Commission and the Texas Workforce Commission by: (1) subjecting White to changed employment conditions in April 2020 when he returned from a year-long medical leave; and (2) failing to respond to Edwards's alleged harassment of White.

UPS argues that White did not experience an adverse employment action, and that it had legitimate, non-retaliatory reasons for its actions.

Under both state and federal antiretaliation law, "[a]n employer . . . commits an unlawful employment practice if the employer . . . retaliates or discriminates against a person who, under this chapter: (1) opposes a discriminatory practice; (2) makes or files a charge; (3) files a complaint; or (4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing." TEX. LAB. CODE § 21.055; *see also* 29 U.S.C. § 623(d); 42 U.S.C. § 2000e-3(a). To support a retaliation claim, "[a] plaintiff must show that (1) [he] participated in an activity protected under [state or federal law]; (2) [his] employer took an adverse employment action against [him]; and (3) a causal connection exists between the protected activity and the adverse action.'" *Feist*, 730 F.3d at 454 (citation omitted); *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 585 (Tex. 2017) (quoting *San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131, 137 (Tex. 2015)).

A materially adverse action for the purpose of a retaliation claim is "not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006). Rather, an action is "materially adverse" if "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (citation and internal quotation marks omitted). Retaliation claims require "but for" causation, "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

When White returned from his second medical leave of absence around April 2020, UPS reinstated him as a Second Preload Manager, because, as White himself acknowledged, UPS had

no vacant manager-level positions in the Houston area.  (Docket Entry No. 34-1 at 31; Docket Entry No. 34-18 at ¶ 2).  White's pay remained the same, but he was not assigned a private office with a key, which he had in his previous management positions.  (Docket Entry No. 34-1 at 31; Docket Entry No. 34-18 at ¶ 2; Docket Entry No. 39-2 at ¶ 9).  Although another manager, Joseph Winston, testified that Preload Managers and Business Managers generally have their own offices, (Docket Entry No. 39-8 at 3–5), UPS points to uncontroverted evidence that it is not uncommon for two Stafford managers assigned to a Preload Manager position to share an office, (Docket Entry No. 34-19 at ¶ 3).

White also alleges that he was excluded from manager meetings.  At one meeting, an operations manager told White to wait upstairs, and White stayed there for over two hours without being asked to join the meeting.  (Docket Entry No. 34-1 at 34–35).  White alleges that on another occasion, a manager asked White to stay and watch the floor during a meeting.  (Docket Entry No. 34-1 at 32).  Other UPS employees contradict White's assertion that he was not invited to attend manager meetings.  (Docket Entry No. 34-3 at ¶ 10; Docket Entry No. 34-19 at ¶ 4).

During this time, White also experienced several negative encounters with a coworker, Business Manager Rodney Edwards.  White alleges that Edwards's first comment to White when the two saw each other was, "look who rose from the dead."  (Docket Entry No. 39-1 at 49).  In June 2020, one of White's coworkers reported to UPS through the corporate call line that Edwards had verbally abused White, calling him a "b**** a** n****."  (Docket Entry No. 39-34 at 2).  White himself does not remember what Edwards called him, but he wrote to Aaron Times to express concern that Edwards was retaliating against him.  (Docket Entry No. 39-35).  UPS interviewed witnesses to the incident and concluded that no single witness heard racist language, but that "witnesses did substantiate that Edwards used profanity, raised his voice, and may have

acted unprofessionally during the incident at issue." (Docket Entry No. 34 at 20–21; Docket Entry No. 34-31). White does not dispute that UPS counseled Edwards on UPS's Professional Conduct and Anti-Harassment Policy and required him to complete courses on acceptable workplace behavior. (Docket Entry No. 34-13 at ¶ 15; Docket Entry No. 34-31). White contended that UPS's response was a "slap on the wrist." (Docket Entry No. 39 at 19). White admits that no similar incident occurred again between him and Edwards. (Docket Entry No. 34-1 at 36).

White has just barely raised factual disputes material to determining retaliation. "[A]llegations of unpleasant work meetings, verbal reprimands, improper work requests, and unfair treatment do not constitute actionable adverse employment actions as discrimination or retaliation." *King v. Louisiana*, 294 Fed. Appx. 77, 85 (5th Cir. 2008) (citing *Burlington N.*, 548 U.S. at 68). But the record evidence shows that after White filed his complaint and returned from extended medical leave, White was excluded from meetings, he had difficulties finding space to work, coworkers verbally abused him, and UPS's response to the verbal abuse was tepid. Although UPS's similar response to an earlier incident of a coworker's verbal abuse does not preclude summary judgment on discrimination, the standard for retaliation is different, and the fact that White again received racial slurs is some evidence of inadequate response. *Burlington N.*, 548 U.S. at 63–64 ("[The antiretaliation provision, unlike the [antidiscrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment."). On the present record, the combined effect of White's workplace conditions and treatment when he returned from his medical leave creates a narrow ground for a reasonable jury to conclude that conditions and treatment could have dissuaded an employee from complaining. A reasonable jury could infer a causal link between the charge of discrimination White filed while on leave and the

treatment he received as soon as he returned.[2]  By a small margin, White meets his burden for summary judgment.

White's retaliation claim for incidents occurring between April 2020 and July 2020 may proceed.

## VIII.   Conclusion

UPS's motion for summary judgment, (Docket Entry No. 34), is granted on all claims but retaliation for incidents occurring from April 2020 to July 2020.

SIGNED on October 22, 2021, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge

---

[2]  It is not clear from the briefing whether White claims that his assignment as "Preload Manager" in April 2020 was also retaliatory.  Assuming White's assignment to the position of "Preload Manager" could be considered a demotion from his previous position as Business Center manager, UPS has pointed to a legitimate, nondiscriminatory reason for White's assignment to Preload Manager:  No other management position in the Houston area was open when White returned to work.  White does not identify evidence disputing this fact.  To the extent White also claims that UPS's response to the Corey incident was retaliation for White's informal complaints to Mayorga about Shumaker's ageist comments, this claim fails because there is no record evidence supporting an inference that UPS's response to the incident with Corey was based on knowledge of White's informal complaints to Mayorga.  (*See* Docket Entry No. 39 at 37); *see also Everett v. Central Miss., Inc. Head Start Program*, 444 Fed. Appx. 38, 47 (5th Cir. 2011) (no *prima facie* causal link when "there is no evidence in the record that those responsible for the adverse employment actions . . . were aware of [the] protected activity").